## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 18 2017, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.C.M., J.O.M., and J.M.J. (Minor Children),

And

J.J. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 18, 2017

Court of Appeals Case No. 79A02-1701-JT-205

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

The Honorable Tricia Thompson, Magistrate

Trial Court Cause Nos. 79D03-1604-JT-39, 79D03-1604-JT-40, & 79D03-1604-JT-41

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, J.J. (Mother), appeals the trial court's Order terminating her parental rights to her three minor children, J.C.M., J.O.M., and J.M.J. (collectively, the Children).

We affirm.

# ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Mother's parental rights.

# FACTS AND PROCEDURAL HISTORY

Mother and J.M. (Father)[1] are the biological parents of three sons: J.C.M., born March 30, 2008; J.O.M., born April 15, 2011; and J.M.J., born January 6, 2013. Mother also has three older sons from prior relationships: L.M.S., born July 10, 2001; Jh.M.J., born September 13, 2004; and Jha.M.J., born February 11, 2006.[2] Father and Mother are not married, but Mother stated that they were involved in an on-again/off-again relationship for about six years.

---

[1] Father's parental rights to the Children were terminated on December 27, 2016. Father does not participate in this appeal.

[2] Although L.M.S., Jh.M.J., and Jha.M.J. were involved in the protective proceedings initiated by DCS, they are not subject to this appeal. Facts pertaining to the Children's older siblings are included where appropriate.

On March 10, 2014, the Tippecanoe County office of DCS received a report alleging that Mother's six children were victims of neglect. In addition, the reporting source claimed that L.M.S. and J.C.M. had been observed with black eyes, which they purportedly received at the hands of Father. It was further alleged that Mother instructed the children not to speak about what happens in their home. Concerns were also noted regarding the children's use of inappropriate language and their exposure to drug use. On March 11, 2014, DCS received a second report concerning the six children. This time, it was alleged that a few of the children had missed "a concerning amount" of school, and an allegation of domestic violence in the home was raised. (DCS Exh. 3, Vol. I, p. 10). Additionally, J.C.M. was overheard telling people that he and the other children smoke marijuana and drink alcohol with Father and that Father forces the children to have sex with each other.

Following these allegations, DCS contacted Mother and requested to interview the children; however, Mother refused to cooperate without a court order. Accordingly, on March 11, 2014, the trial court held a hearing and issued an order to allow DCS to interview the children. Six-year-old J.C.M. disclosed to DCS that Mother and Father use a belt to punish them, and that his black eye was the result of being hit with a belt. J.C.M. also divulged that Father had "choked out" nine-year-old Jh.M.J. (DCS Exh. 5, Vol. I, p. 11). Eleven-year-old L.M.S. had bruises on his arm for which he did not provide an explanation, but Mother admitted that they were the result of her "smack[ing] him." (DCS Exh. 5, Vol. I, p. 9). L.M.S. and Jh.M.J. added that, as punishment, the

children are forced to "do squats." (DCS Exh. 5, Vol. I, p. 9). Eight-year-old Jha.M.J. informed DCS that Mother had instructed him and his siblings not to discuss what happens in their home at the threat of being taken away from their family. The children advised DCS that Father does not live in their home, but he visits occasionally. Almost-three-year-old J.O.M. and one-year-old J.M.J. were not interviewed due to their young age. When DCS spoke with Mother, she voiced her displeasure over the "system" becoming involved with her family and reported that she had been doing her best to manage her children's "out of control" behaviors. (DCS Exh. 5, Vol. I, p. 9). On March 12, 2014, DCS filed a petition alleging all six children to be Children in Need of Services (CHINS).

[7]     On April 7, 2014, the trial court held an initial hearing on DCS' CHINS petition. DCS was authorized to refer the family for services and certain conditions were implemented in order to allow Mother to keep the children in her custody. Following the hearing, Mother and the children submitted to drug screens. Mother and the three youngest Children all tested positive for cocaine and marijuana. The three oldest children were unable to be tested because their hair was too short. Based on the positive drug screens, on April 16, 2014, DCS removed the children from Mother's custody. The three oldest children were placed in foster care, whereas the three youngest Children were placed in the home of their paternal grandparents in Grant County, Indiana. The paternal grandparents "provide a very welcoming, loving, stable environment to the [C]hildren" and intend to adopt them. (Tr. Vol. II, p. 166).

[8]     On May 21, 2014, the trial court adjudicated the six children CHINS. On June 9, 2014, following a dispositional hearing, the trial court issued a dispositional order, granting wardship of the children to DCS. In conjunction therewith, the trial court issued a Parental Participation Decree, which required Mother to, in pertinent part: contact DCS at least twice per month; obtain and maintain safe housing suitable for the children; refrain from consuming or possessing any controlled substances or alcohol; submit to random drug screens upon request; obtain and maintain a legal and stable source of income; enroll in any services referred by DCS and follow all recommendations from any assessments or evaluations; and obey the law. More specifically, and in accordance with DCS' recommendations, Mother was required to participate in supervised visits with the children, participate in home-based case management and follow all recommendations; participate in a substance abuse assessment and follow all recommendations; participate in a domestic violence assessment and follow all recommendations; and participate in a parenting assessment/parenting education and follow all recommendations.

[9]     At first, Mother's participation was minimal, but by the end of 2014, she "became visibly serious about making necessary changes." (DCS Exh. 6, Vol. I, p. 57). In early 2015, DCS was considering returning the children to Mother's care for a trial-home visit. Mother was actively engaged with her home-based case management, participating in therapy, and regularly attending visitation with the children. Her interactions with the children were appropriate, and a loving bond was evident. Also, Mother was involved in a

substance abuse program and was making strides, as indicated by periods of sobriety. Moreover, Mother had been successful in maintaining housing, and while she changed jobs throughout the case, Mother was consistently employed to the extent that she was able to support herself. Nevertheless, when the time came to transition the children into the home, Mother declined. Mother indicated "that she felt as though she was not quite ready yet, she wanted to finish some services that she was participating in." (Tr. Vol. II, p. 121).

[10] Thereafter, Mother was unable to maintain the positive progress she had made. Mother relapsed in her marijuana use, and although she occasionally had negative drug screens, Mother consistently reverted to marijuana to cope with stress and being overwhelmed. The children—especially the oldest three—displayed disturbing behaviors and were shifted around to different foster homes. Eventually, in order to make visitations more manageable, Mother began spending time with the three oldest children apart from the youngest Children. Mother was "inconsistent" in "her belief in her ability to provide for all six of the children." (DCS Exh. 6, Vol. II, p. 94).

[11] Also, DCS and Mother's service providers were concerned about Mother's apparent ongoing relationship with Father and the dangers that such a relationship posed to both Mother and the children. During conversations with the children, it was discovered that Father had been present during some visits. Even more concerning, in April of 2015, Father "kicked in" Mother's back door while the children were in the home, and "a dispute" ensued. (Tr. Vol. II, p. 50). Father was subsequently arrested for this incident, and Mother eventually

obtained a protective order against him. However, even after Father was incarcerated for this occurrence, and notwithstanding the protective order, the jail phone logs indicate that Father and Mother continued to communicate.

[12] In the summer of 2015, Mother was still struggling with her sobriety, but she had completed all required assessments, completed her substance abuse treatment program, was participating in weekly therapy sessions, and consistently visited with the children. Because of the need to keep the case moving forward and the fact that reuniting Mother with all six children in the necessary timeframe did not seem feasible, it was determined that the three oldest boys would be transitioned to their maternal grandmother's care under a guardianship so that DCS could shift focus to help Mother reunify with the Children. Accordingly, on August 8, 2015, L.M.S., Jh.M.J., and Jha.M.J. moved to Memphis, Tennessee, to reside with their maternal grandmother.

[13] Two weeks after the oldest boys moved to Tennessee, Mother was arrested and charged with operating while intoxicated endangering a person, a Class A misdemeanor; operating while intoxicated with a blood alcohol concentration of at least 0.15, a Class A misdemeanor; resisting law enforcement, a Level 6 felony; possession of a synthetic drug with a prior possession conviction, a Class A misdemeanor; failure to stop after an accident with an unattended vehicle, a Class B misdemeanor; and disorderly conduct, a Class B misdemeanor. Mother subsequently pled guilty to driving while intoxicated with a blood alcohol concentration of at least 0.15, a Class A misdemeanor; possession of a synthetic drug with prior possession conviction, a Class A

misdemeanor; and failure to stop after accident with unattended vehicle, a Class B misdemeanor. Mother received an aggregate sentence of 730 days, of which 180 days were ordered to be served through Community Corrections with the remaining 545 days suspended to probation. As a result of her criminal conviction, Mother lost her subsidized housing and moved in with a friend. She additionally lost her driving privileges.

[14] Also in August of 2015, Mother and Father were involved in another domestic dispute. DCS received information that "[Father] broke into [Mother's] home, kept her from leaving the house, he and [Mother] w[ere] in the bathroom fighting, he—he beat on [Mother] and she was—she reported that she was only able to get away when she told [Father] that the children were coming for a visit." (Tr. Vol. II, p. 123). According to Mother, however, "it was a domestic dispute on both parts, it wasn't . . . just all [Father]." (Tr. Vol. II, p. 52). The police were called in response to the incident, and Mother sustained a black eye and several scratches. Father was convicted of numerous charges as a result of this incident and received a four-year sentence.

[15] Mother's growing frustration with DCS and her service providers resulted in her refusal to cooperate. Mother failed to maintain regular contact with DCS, and she failed to appear for all drug screens. Visits were cut short due to Mother's erratic behavior and aggression towards service providers, and Mother was discharged from therapy and case management services due to her non-compliance. DCS also discovered that Mother was having conversations with the Children about the progress of the case, which triggered negative behaviors

in the Children—particularly J.C.M., who was repeatedly suspended from school and from riding the school bus.

On April 20, 2016, DCS filed a petition to terminate Mother's parental rights to the Children. On July 15, 2016, and September 20, 2016, the trial court conducted a hearing on DCS' termination petition. On December 27, 2016, the trial court issued an Order for Involuntary Termination of Parental Rights. In terminating Mother's parental rights to the Children, the trial court concluded, in part, that "[t]here is a reasonable probability the conditions that resulted in removal of the [C]hildren from the parents' care or the reasons for continued placement outside the home will not be remedied"; "[c]ontinuation of the parent-child relationship poses a threat to the well-being of the [C]hildren"; and "it is in the best interests of [the Children]" to terminate Mother's parental rights. (Appellant's App. Vol. II, pp. 19-20).

Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Mother challenges the trial court's termination of her parental rights. It is well-established that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). In fact, the Fourteenth Amendment to the United States Constitution protects "the traditional right of parents to establish a home and

raise their children." *Id.* Yet, "parental rights are not absolute and must be subordinated to the child's interests." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Parental rights may be terminated if the "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. Nevertheless, the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[19]     When reviewing a trial court's termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Rather, we "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* In addition, the trial court in the present case issued specific findings of fact and conclusions thereon. As such, we apply the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will find clear error only "if the findings do not support the trial court's conclusions or the conclusions do not

support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination Statute*

To support the termination of a parent's rights, DCS must prove, in pertinent part, that a child has been removed from the home for a certain period of time, and

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each element by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260.

On appeal, Mother does not specifically challenge any of the trial court's findings; rather, she essentially asserts that the trial court's findings, and the evidence supporting them, are insufficient to uphold the trial court's conclusions regarding the elements of the termination statute. Mother concedes that DCS has established that the Children have been removed from her care for the requisite timeframe and that there is a satisfactory plan in place for the

Children's care. Thus, Mother argues that DCS failed to prove that there is a reasonable probability either that the conditions that resulted in the Children's removal and ongoing placement out of the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Children,[3] and that termination is in the Children's best interests. We will address each element in turn.

## A. *Remediation of Conditions*

In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside of the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted) (internal quotation marks omitted) (quoting *Bester*, 839

---

[3] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; thus, DCS need only prove one of the three elements listed. *See In re A.K.*, 924 N.E.2d 212, 220-21 (Ind. Ct. App. 2010), *trans. dismissed*. In this case, DCS did not allege that the Children have been twice adjudicated CHINS. Therefore, the relevant inquiry is whether DCS established the existence of a reasonable probability either that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Children's well-being.

N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[23] In this case, DCS became involved over allegations of neglect and physical abuse, as well as substance abuse and domestic violence. Although a safety plan was initially put in place for the Children to remain in Mother's care, they were removed from her custody after Mother and the Children all tested positive for cocaine and marijuana. Thereafter, as indicated in the trial court's findings, the Children remained wards of DCS based on Mother's unresolved substance abuse, her continued contact with Father, her seeming inability to handle the needs of all six children, and her failure to fully cooperate with DCS and complete the recommended services. Mother now asserts that "[t]he facts in this case show [that she] made substantial progress. Flawless participation is not required." (Appellant's Br. p. 14). She argues that she, in fact, remedied the reasons for the Children's removal because she

> attended drug treatment and was seventy days sober at the time
> of the second day of [the termination] hearing in this matter. She
> also obtained a protective order against [Father][.] Mother also
> received counseling for the domestic violence. . . . She also

crafted a safety plan to deal with any issues of domestic violence.
. . . Father was no longer a threat at the time of the termination
[hearing] as he was incarcerated at the Department of
Correction[].

(Appellant's Br. p. 14) (internal citations omitted). With respect to her struggle to maintain sobriety during the pendency of the case, Mother blames DCS for refusing to provide in-patient drug treatment and thus claims that she "should not be penalized" for DCS' failure to provide sufficient services. (Appellant's Br. p. 15).

[24] Mother's argument is tantamount to a request that we reweigh evidence, which we will not do. The evidence establishes that nearly two and one-half years elapsed between the Children's removal and the termination hearing. During that time, Mother failed to improve her position to the point of being able to care for the Children. At the time of the termination hearing, Mother did not have housing or transportation, she was unemployed, and she was incarcerated. Furthermore, Mother testified that she did not have any plans for where she would live upon her release, even though she stated that she only had thirty-three days left to serve. Most significantly, Mother admitted during the termination hearing that she was not yet capable of caring for the Children. Mother suggested that the Children remain with their paternal grandparents and that she be given additional time to implement the necessary changes.

[25] Despite completing the substance abuse program recommended by DCS and independently engaging in follow-up services, Mother used marijuana

throughout the pendency of the case. DCS acknowledged that Mother requested in-patient treatment; however, as a matter of policy, DCS explained that it does not refer parents to in-patient treatment for marijuana issues. Regardless, the onus was on Mother—not DCS—to remedy her substance abuse issues. *See In re B.H.*, 44 N.E.3d 745, 752 n.3 (Ind. Ct. App. 2015) ("[I]t is well established that DCS is not required to provide services before commen[c]ing termination proceedings."), *trans. denied*. As to Mother's claim that she had been sober for seventy days preceding the termination hearing, it is well-settled that the trial court is free to disregard efforts "made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts." *K.T.K.*, 989 N.E.2d at 1234.

[26]     The trial court found that "Mother has not demonstrated an ability to protect herself from Father's violence[,] let alone the [C]hildren." (Appellant's App. Vol. II, p. 18). During the CHINS investigation, Mother admitted to causing some of the bruises observed on the children, but the brunt of the physical abuse was indisputably committed by Father. Yet, despite court orders to the contrary, Mother maintained communication with him and permitted (or acquiesced to) his presence during her visits with the Children. While Mother should not bear blame for the domestic violence perpetrated against her, we find that her continued voluntary contact with Father is indicative of Mother's inability to put the best interests and safety of the Children ahead of her own desires.

[27]     Moreover, although Mother participated in services at certain points throughout her case, even reaching a point where DCS believed that she was prepared for a trial home visit with all six children, Mother declined to have the children returned to her care and subsequently failed to maintain the progress that she had achieved. DCS re-referred Mother for therapy and case management services multiple times during the case, but Mother was consistently discharged for non-compliance. As the trial court found, "[f]or over two (2) years, all imaginable services have been offered and parents have either failed to participate consistently or to make substantial progress in those services." (Appellant's App. Vol. II, p. 19). Furthermore, the trial court aptly noted that both parents failed to "ma[k]e the children a priority" and instead "continue[d] to focus on drugs and each other rather than reunification with the children." (Appellant's App. Vol. II, p. 19). Accordingly, we find that there is sufficient evidence to support the trial court's determination that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement out of the home will not be remedied.[4]

### B. *Best Interests of the Children*

[28]     The purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003),

---

[4] As there is sufficient evidence of a reasonable probability that conditions will not be remedied, we need not address the alternative element of Indiana Code section 31-35-2-4(b)(2)(B) regarding whether the continuation of the parent-child relationship poses a threat to the Child's well-being. *See In re A.K.*, 924 N.E.2d at 220-21 (discussing that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, only one of the listed factors need be established).

*trans. denied*. Thus, while "[c]lear and convincing evidence need not reveal that the continued custody of the parent . . . is wholly inadequate for the child's very survival[,] . . . it is sufficient to show . . . that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1234-35 (first and fourth alterations in original) (quoting *Bester*, 839 N.E.2d at 148). When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. It is well established that "[p]ermanency is a central consideration in determining the [child's] best interests." *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265).

[29] Mother contends that the trial court's determination that termination of her rights is in the best interests of the Children cannot stand because

> [i]t is clear that [she] has made some strides in both her personal stability and her ability to parent her [Children]. Mother is bonded to her [C]hildren. The [C]hildren have a relationship with their Mother, and it would not be in their best interests to have their relationship with their biological parent severed. Case law does not require that persons be model parents.

(Appellant's Br. p. 18).

[30] It is well established that "the recommendation by both the [DCS] case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *A.D.S.*, 987 N.E.2d at 1158. Here, DCS opined that the Children's best interests would be served by terminating Mother's rights. DCS discussed Mother's ongoing struggle with sobriety and her failure "to utilize the services to the best of her ability to become rehabilitated. [Mother] continued to struggle with her relationship with [Father], continually putting the [C]hildren in jeopardy." (Tr. Vol. II, pp. 144-45). The Children's court-appointed special advocate (CASA) agreed that Mother's parental rights should be terminated. Noting Mother's unresolved issues, the CASA testified that "the [C]hildren need to have stability and they need to have a home and they need permanency. So we just can't wait for [Mother] to get there." (Tr. Vol. II, p. 168). According to the CASA, the Children are bonded to their paternal grandparents, and they "follow the rules and regulations of the home[.] . . . It's a very nice home; big yard, lots of age appropriate toys." (Tr. Vol. II, p. 166).

[31] Although she preferred a situation in which the paternal grandparents could obtain a guardianship in lieu of the termination of her rights, even Mother agreed that the Children's interests required remaining in the care of their paternal grandparents. Admirably, Mother recognized the upheaval she caused in the Children's lives, and she stated that she did not "want to cause them anymore than what they've already been through. . . . I don't want them to

encounter anything else that is not positive, uplifting. I want to help them grow into positive young men." (Tr. Vol. II, p. 63). Therefore, we find that DCS presented sufficient evidence to support the trial court's determination that termination of Mother's parental rights is in the Children's best interests.

# CONCLUSION

[32] Based on the foregoing, we conclude that DCS presented sufficient evidence to support the trial court's Order terminating Mother's parental rights to the Children.

[33] Affirmed.

[34] Najam, J. and Bradford, J. concur